## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| HAHNAH WILLIAMS, as | * | |
| Administrator of the Estate of | * | |
| Matthew Zadok Williams | * | |
| and CHRIS ANN LEWIS, | * | |
| | * | Civil Action No.: |
| Plaintiffs, | * | |
| | * | **Jury Trial Demanded** |
| v. | * | |
| | * | |
| DEKALB COUNTY, GEORGIA, a | * | |
| Political Subdivision of the State of | * | |
| Georgia, | * | |
| | * | |
| Defendant. | | |

## <u>COMPLAINT FOR DAMAGES</u>

Plaintiff HAHNAH WILLIAMS, as Administrator of the Estate of Matthew Zadok Williams and Chris Ann Lewis as heir to the Estate of Matthew Zadok Williams, file this Complaint for Damages against Defendant DEKALB COUNTY, GEORGIA, a Political Subdivision of the State of Georgia, pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132-12133, and the Rehabilitation Act of 1973, 29 U.S.C. §794. In support of their Complaint, Plaintiffs show the following:

1

**INTRODUCTION**

This is a civil action asserting claims under federal law for disability discrimination in the activities of a public entity and for Defendant's policy of failing to adequately train police officers to safely arrest persons with mental illness. Plaintiffs demand a jury trial and seek an award of economic and compensatory damages, as well as an award of attorneys' fees and costs.

**PARTIES, JURISDICTION AND VENUE**

1.

Plaintiffs are residents of Georgia. Hahnah Williams is the duly appointed Administrator of the Estate of Matthew Zadok Williams. Chris Ann Lewis is the mother of Matthew Zadok Williams and the heir to his Estate.

2.

Defendant is a political subdivision of the State of Georgia and is amenable to suit and subject to personal jurisdiction in this Court. Defendant operates the DeKalb Police Department ("DKPD"). Defendant may be served with Summons and a copy of the Complaint through its Chief Executive Officer, Michael L. Thurmond, at his place of employment located at the Manuel J. Maloof Center, 1300 Commerce Drive, 6th Floor, Decatur, Georgia, 30030.

3.

Venue is proper in this District.

## **FACTUAL ALLEGATIONS**

4.

This lawsuit arises from an incident on April 12, 2021, when DKPD Sergeant Devon Perry ("Perry"), employed by the Defendant, shot and killed the homeowner of a townhome located at 2557 Terrace Trail Decatur, DeKalb County, Georgia, while attempting to take him into custody.

5.

When Perry shot him to death, the homeowner, Matthew Zadok Williams ("Zadok"), was having a mental health crisis. As later proven by toxicology reports, Zadok was not on drugs but was having an episode of mental illness.

6.

Matthew Zadok Williams was the youngest, and the only son, of six siblings. His family called him by his middle name, "Zadok," an Old Testament Biblical name meaning "Righteous" and "Justice."

7.

This fatal incident began when Zadok was locked outside his townhome that he purchased in 2009.

8.

While locked outside of his home, Zadok had rubber gloves, a bucket, and a blue plumber's knife with him.

9.

DKPD Officers Morgan and Lamy initially responded to the scene. They found Zadok sitting on his deck.

10.

Morgan attempted to speak with Zadok, but Zadok was not responsive because he was experiencing a mental crisis.

11.

Morgan told Zadok that if he didn't live there, he would have to leave the property.

12.

Zadok began following Morgan, but then ran towards him with the knife. Morgan stumbled, and Zadok ran away.

13.

Lamy fired a shot at Zadok as he was fleeing.

14.

By the time Perry arrived, Zadok had re-entered his townhome by breaking a window. The door to the townhome was locked, and officers had the front and back doors covered.

15.

At this point, Zadok was a "barricaded individual," and DKPD policy required the officers on the scene to call SWAT so that a team with proper tactical and negotiation training could respond.

16.

Perry was the senior and commanding officer at the scene when he arrived.

17.

Perry called his superior officer, Lieutenant James, who authorized Perry to force entry to the townhome. Lieutenant James was also employed by Defendant at all relevant times.

18.

Neither Lieutenant James nor Perry called SWAT at this time.

19.

Perry approached Zadok's door with his gun drawn.

20.

Perry ordered Morgan to "go non-lethal." Morgan drew his Taser.

21.

Perry ordered DKPD Officer Walker ("Walker") to "go lethal". Walker drew his gun.

22.

Sgt. Perry, Officer Morgan, and Officer Walker pointed their weapons at Zadok's closed front door and advanced toward the door.

23.

Sergeant Perry announced himself.

24.

One officer knocked on the door, and Zadok responded by asking for a search warrant.

25.

Sergeant Perry then ordered Walker to kick open the door.

26.

Upon the door being kicked open, Zadok immediately dropped to the floor on his knees and used an ottoman to hide and shield himself from the officers.

27.

Zadok reached out with his hand and swiped the door closed.

28.

Walker kicked the door back open, and Perry fired his first shot at Zadok.

29.

Perry could see that Zadok had moved a piece of furniture to block the door.

30.

Perry could see that Zadok had moved from behind the ottoman to a spot behind the wall next to the door, where he could more easily reach to shut the door.

31.

Walker kicked open the door again, and again each time Zadok closed it by reaching his arm out beyond the wall and using his hand to close the door.

32.

Perry and his officers kicked the door open a third time, and a fourth. Morgan fired his Taser at Zadok, but the Taser probes did not make an effective connection.

33.

Zadok did not threaten the officers, but he closed the door each time that the officers kicked it open.

34.

Zadok asked the officers to lower their guns so he could speak with them "cordially."

35.

At no point did Zadok, yell, raise his voice, curse, or threaten the officers.

36.

Instead, Zadok, in the midst of his mental health crisis, called the officers "sir" and asked to speak with them "cordially."

37.

In response, Perry yelled to Zadok, "you don't have to die tonight."

38.

At this point in the encounter, Perry did not believe that Zadok had been hit by any of the previous shots.

39.

On Walker's fifth kick, the door swung open. Zadok attempted to close the door a fifth time.

40.

Zadok did not come through the door to threaten the officers.

41.

Zadok continued to shield himself behind the wall next to the door.

42.

As Zadok reached to close the door, Sergeant Perry fired three shots through the door as the door was closing.

43.

Zadok was hit but succeeded in closing the door as he had done each of the previous times.

44.

After Perry fired the three shots at Zadok through the closing door, Perry ordered his subordinate officers to "back off" so he could contact SWAT.

45.

Morgan, Lamy, and Walker remained on Zadok's porch.

46.

Perry walked down the steps of Zadok's townhome and called Lieutenant James.

47.

Lieutenant James did not immediately call SWAT. Instead, he first called the Criminal Investigation Division and Internal Affairs, while Zadok lay bleeding, suffering, and dying on his own floor.

48.

When James finally called for SWAT assistance, Captain Swain of the SWAT team told James he was more than an hour away and asked if Zadok was "in there bleeding out."

49.

Swain reminded James and Perry that they were required to provide medical assistance if Zadok was shot. Specifically, Swain said, "If he's in there bleeding out, it's on us."

50.

At the time Perry shot Zadok, Emergency Medical Services ("EMS") personnel were already on the premises for another incident and offered to provide medical assistance to Zadok, but James refused the offer saying, "He's [Zadok] the only one hurt."

51.

While James and Perry were waiting for SWAT to arrive, Zadok died from bleeding out, losing twenty-five percent of his blood volume as a result of being shot by Perry.

DKPD's History of Mishandling Mental Health Crises

52.

This incident is not the first in which a DKPD officer has killed a DeKalb County citizen who was having a mental health crisis. In fact, DeKalb County policymakers have known for years that DeKalb does not provide its police officers with adequate training and resources to safely respond to mental health crises.

53.

In 2015, a DeKalb officer shot and killed an unarmed veteran named Anthony Hill who was running naked outside an apartment complex.  The officer was later criminally convicted for Aggravated Assault, Violation of Oath by Public Officer, and Making a False Statement.

54.

DeKalb County Public Safety Commissioner Cedric Alexander told DeKalb's Board of Commissioners in March 2015 that he wanted all current and incoming

officers to complete 40 hours of Crisis Intervention Team ("CIT") training to enable them to recognize and de-escalate mental health crises.

55.

On June 4, 2017, a homeless woman named Katie McCrary was severely beaten during a mental health crisis by a DeKalb County Master Police Officer named Phillip Larscheid. The episode was captured on video by a bystander and the story made national news. Officer Larscheid was later indicted; but six years later, DeKalb                                        County's                                        District Attorney still has not taken his case to trial.

56.

On August 2, 2017, a veteran named Quintas Harris was shot and killed by DeKalb Police while having a mental health crisis.

57.

As of October 2017, only 51% of DeKalb County Police Department officers had been trained in CIT. In contrast, as of 2017, DeKalb Sheriff's Office required CIT training for all officers who interacted with suspects or inmates because of the high proportion of persons with mental illness detained in the DeKalb County Jail.

58.

After the killing of Quintas Harris in 2017, DeKalb County CEO Michael

Thurmond stated publicly that he was going to request funds in the 2018 budget to

train all DeKalb police officers in CIT.

### DKPD's Inadequate Implementation of the CIT Approach

59.

In 2018, the Superior Court of DeKalb County convened a grand jury to

examine DeKalb County's police force. The grand jury recommended that the

County increase funding to train DeKalb police officers in dealing with arrestees

who have mental illness.

60.

In the 2018 budget, CEO Thurmond requested only $150,000 to train DKPD

officers on how to interact with people with mental health issues. This amount was

budgeted as "Mental health and peer support" for FY 2018. Upon information and

belief, less than the full $150,000 was spent on training.

61.

The sum of $150,000.00 was allocated again in Fiscal Year 2019, but the

entire allocation was discontinued for Fiscal Year 2020, even though many officers

had not yet received the training.

62.

Because Defendant did not complete the CIT training effort, many DKPD officers, including Sergeant Perry, had not received CIT training as of May 2021.

63.

CIT training is a widely recognized and adopted law-enforcement training that has been available from the State of Georgia at all relevant times. The CIT program, implemented by the State of Georgia in 2006, is sponsored by the National Alliance on Mental Illness, Georgia Department of Human Resources Division of Mental Health, Developmental Disabilities and Addictive Diseases, Georgia Bureau of Investigation, Georgia Association of Chiefs of Police, Georgia's Sheriff's Association, Inc., and Georgia Public Safety Training Center.

64.

The State of Georgia's CIT Manual outlines a 40-hour course that teaches officers how to recognize and de-escalate mental health crises.

65.

CIT's mission is to "equip Georgia law enforcement officers with the skills to assist those with mental illnesses and other brain disorders in crisis, thereby advancing public safety and reducing stigma." Brain disorders may include mental illness, developmental disability, or addictive disease.

14

66.

One of CIT's objectives is to "Protect the rights of people with mental illness and other brain disorders."

67.

The CIT Mission and Policy Statement recognizes that the Americans with Disabilities Act ("ADA") "mandates that law enforcement agencies and personnel make reasonable adjustments and modifications in their policies, practices, or procedures on a case-by-case basis.   For example, when a person exhibiting symptoms of a brain disorder presents or expresses that he or she has a specific brain disorder or requests accommodations, officers and caretakers may need to modify routine practices and procedures and dedicate more time or exercise more sensitivity to extend the services or protections that would be extended to someone else in a similar circumstance".

68.

A major goal of CIT training is to make encounters safer for police officers, as well as for individuals in mental crisis.

69.

The "Memphis Model" of CIT, which is the original and prevailing approach, requires a department not just to train  officers, but also to support them with a 24-hour mobile response unit staffed by mental-health professionals.

70.

DeKalb's Mobile Crisis Unit (MCU) is operated by the DeKalb Community Health Board (DCHB), which also provides mental health services at the Jail, DeKalb DD Services Center, East DeKalb, DeKalb Crisis Center, Winn Way Outpatient and the Opioid Residential Treatment program.

71.

The DeKalb County Mobile Crisis Unit (MCU) is a "cooperative effort between the DeKalb County Police Department, the DeKalb County Sherriff, and DeKalb County Mental Health."

72.

The purpose of the MCU is to assist DKPD officers when responding to crisis situations.

73.

Because of under-funding by the County, during the period from 2017 through 2022, the MCU was staffed with only one psychiatric nurse and one police officer for the entire county and was operated only part-time.

74.

On March 16, 2021, and April 12, 2021, the MCU was only operating during the Evening Watch and would "routinely respond to the following types of calls: Suicide, Drug/Alcohol Addiction/Mental Health, and Mental Retardation."

75.

In July 2018, Quintas Harris's mother spoke at a "lunch and learn" with then-Police Chief James Conroy. At that event, Chief Conroy stated that the DeKalb County Jail was the largest provider of mental health services in the Southeastern United States and acknowledged that there was an unmet need for the MCU to be fully staffed and funded. The County did not add any funding.

76.

For FY 2020, CEO Thurmond requested a 44% increase in funding for the DCHB, from $2,134,057 to $3,079,057. The Board of Commissioners did not approve any increase. For FY 2021, the CEO requested a 13% increase in funding

for the DCHB, from $2,134,057 to $2,429,057. Again, no increase was approved by the Board of Commissioners.

77.

Finally, when the American Recovery Act provided federal funds in 2022, Defendant budgeted $180,000 of that federal money to create three additional nurse positions for the MCU.

<u>Prior to Zadok's shooting death by Perry, Zadok called 911 for help during a mental health crisis on March 16, 2021.</u>

78.

Before his shooting death by DKPD on April 12, 2021, on the night of March 16, 2021, Zadok called 911 at least two times and requested assistance.

79.

Zadok was experiencing a mental health crisis.

80.

He requested an ambulance be sent to his home.

81.

Zadok said that he was "being stalked."

82.

He requested that the FBI be sent to his home.

18

83.

During what appeared to be a delusional state, Zadok made references to the "Devil" to the 911 dispatcher.

84.

DKPD officers Kameron Brooks and Mikhail Morgan responded to the scene.

85.

Mikhail Morgan is the same Officer Morgan who responded to Zadok's address during the April 12, 2021 incident that is the subject of this lawsuit.

86.

On March 16, 2021, the officers remained on the scene for over an hour.

87.

On March 16, 2021, the officers reported the incident as a "Behavioral Health Crisis."

88.

During Zadok's Behavioral Health Crisis on March 16, 2021, no ambulance was called.

89.

During Zadok's Behavioral Health Crisis on March 16, 2021, no mental health professional was consulted by the officers.

19

90.

After Zadok's Behavioral Health Crisis on March 16, 2021, no police report was generated.

91.

After Zadok's Behavioral Health Crisis on March 16, 2021, the DKPD did not make a mental health referral for Zadok.

92.

The Defendant does not maintain any data regarding police mental health encounters so as to flag them for follow-up services or keep track of whether officers are handling them properly.

**Defendants Had Actual and Constructive Notice of Zadok's Mental Health Crisis prior to Perry's fatal shooting of him on April 12, 2021.**

93.

The incident-in-suit took place on April 12, 2021, less than one month after Zadok had called 911 for help on March 16, 2021.

94.

The 911 complainant did not recognize Zadok as a resident of the townhome community and described him to the dispatcher as a homeless person in an altered mental state.

95.

The 911 complainant reported that Zadok had been lying in the woods.

96.

The 911 complainant reported that Zadok was walking aimlessly around the townhomes.

97.

The 911 complainant called 911 a second time and told the operator that she startled Zadok, that he pulled a knife out, and that he immediately tried to hide the knife, before walking away.

98.

These facts described by the 911 complainant put DeKalb County and its officers on notice that Zadok was in mental crisis.

99.

Officer Morgan, who responded to the April 12, 2021 incident-in-suit, was one of the DKPD officers who had responded to Zadok's mental health episode at the same address on March 16, 2021.

100.

Morgan and Lamy met with a person from the same residence as the 911 complainant, hereafter referred to as the "on scene complainant."

101.

The on-scene complainant told Morgan that Zadok had been moving and running sporadically through the woods.

102.

While speaking to the on-scene complainant, Morgan acknowledged that he had been to the townhome "the other day" and that he thought Zadok lived there.

103.

After speaking to the on-scene complainant, Officer Morgan approached Zadok's townhome and found Zadok on the porch.

104.

Zadok's behavior on the porch confirmed the suspicions of the officers that he was having a mental health crisis.

22

105.

Morgan asked Zadok if he could read his hat.  Zadok did not respond.

106.

Morgan attempted to further engage Zadok, but he was not verbal and did not respond.

107.

Morgan knew that Zadok was having a mental health crisis.

108.

Despite his previous encounter with Zadok at the same address, Morgan told Zadok that if he did not live there, he would have to leave.

109.

Morgan directed Zadok to follow him off the porch.

110.

Zadok complied with Morgan's directions and left the porch, but suddenly ran towards Morgan with the knife and then ran away, further confirming that he was in a mental health crisis.

111.

DKPD Officer Walker arrived at the scene as Zadok was still hiding near his townhome.

112.

Zadok told Walker "I locked myself out."

113.

Despite knowing that Zadok had called for police assistance at this address before, Morgan yelled at Zadok, "you don't live here man."

114.

Morgan wrongfully treated Zadok as if he were homeless, even though Morgan had previously been at the residence and interacted with Zadok due to a mental health crisis.

115.

Sgt. Perry also knew Zadok was having a mental health crisis at all relevant times. After the shooting death, Perry told the DKPD Internal Review Board that he attempted to call the MCU *en route* to Zadok's home because he knew that Zadok was having a mental health crisis.

116.

Zadok's behavior and remarks to Perry during the incident-in-suit further confirmed to Perry that Zadok was having a mental crisis.

**When Perry arrived, the scene was stabilized and Zadok was barricaded in his townhome.**

117.

After being dispatched to the scene, it took Perry over 10 minutes to arrive on the scene.

118.

Prior to Perry's arrival Zadok was locked in his home.

119.

For over 10 minutes prior to Perry's arrival Zadok did not attempt to leave his home.

120.

For over 10 minutes prior to Perry's arrival Zadok did not make any verbal threats.

121.

For over 10 minutes prior to Perry's arrival Zadok did not make any threatening gestures.

122.

For over 10 minutes prior to Perry's arrival and after his arrival, DKPD personnel expressed no concerns that Zadok had any hostages or anyone else in the townhome with him.

123.

For over 10 minutes prior to Perry's arrival and after his arrival, DKPD personnel expressed no concerns that Zadok had a firearm.

124.

Prior to Perry arriving on the scene Zadok's townhome was surrounded by DKPD police officers.

125.

DKPD Officers had every entrance of Zadok's home guarded.

126.

When Perry arrived on the scene he had no reason to believe that any officer's life was in imminent danger.

127.

When Perry arrived on the scene he had no reason to believe that any third party's life was in imminent danger.

128.

Zadok was locked in the home and was not a threat of any immediate bodily harm to the officers or civilians.

129.

Perry contacted Lieutenant James and requested permission to make a forcible entry into Zadok's home.

130.

Though Perry was aware that Zadok had a knife in his possession, Zadok was never physically close enough to Perry or any other officers for the knife to be considered an imminent threat.

131.

Additionally, Perry knew that Zadok was not an imminent threat to any officer if a closed door was in between Zadok and the officers.

132.

Perry's stated reason for making forcible entry was to see if Zadok had been injured by Lamy's shot and needed medical assistance.

133.

Perry asked Zadok if he had been shot.

134.

After repeatedly having Zadok's door kicked in by other officers, Perry did not report seeing Zadok shot or injured.

135.

Rather than to assess whether Zadok was injured from Lamy's shot, Perry began shooting at Zadok.

136.

James and Perry did not discuss the possibility that Zadok was a "barricaded person", as defined by the International Association of Chiefs of Police ("IACP") and DeKalb County policy.

137.

James and Perry did not discuss the DKPD requirement to activate SWAT for a barricaded person prior to deciding to make a forcible entry.

138.

 Perry came on Zadok's porch and made verbal contact with him through the locked door.

139.

After making verbal contact with Zadok Perry determined that Zadok was refusing to come out of his home.

140.

The "services and protections" that police departments provide a "barricaded person" as defined by the International Association of Chiefs of Police ("IACP") are to activate SWAT and engage a trained negotiator.

141.

On April 12, 2021, the services of activating SWAT and engaging a trained negotiator were not provided to Zadok during his mental health crisis.

142.

 Perry had time and opportunity to provide Zadok these services, as required by DeKalb County Standard Operating Procedures, and advocated for by the IACP, which would have been safer both for Zadok and for the officers at the scene.

143.

Perry had time to activate SWAT and engage a trained negotiator.

144.

The totality of the circumstances allowed Perry the time and opportunity to activate SWAT and engage a trained negotiator.

145.

CIT training advises the officer to introduce themselves and ask the name of the person they are interacting with.

146.

CIT training advises officers to be prepared to explain the reason they are at an individual's home.

147.

CIT training advises officers to engage in active listening and focus on what the "consumer" is saying and "being sincere and real will convey understanding".

148.

Perry never asked Zadok his name.

149.

The day after the incident, DeKalb County falsely stated on Twitter that Zadok had been shot because he "lung[ed] at the officers . . . causing one of them to discharge his firearm."

150.

In contrast, Perry admitted in his post-incident interview that Zadok never lunged at him or any of the other officers.

151.

DKPD convened an Internal Review Board ("IRB") to review the incident.

152.

Of the nine-member IRB, four members found that Perry's use of force was justified; three found that it was unjustified; and two abstained.

153.

Even though the IRB found that Perry did not violate any of Defendant's policies and that his use of force was reasonable, the IRB also found that James and Perry had handled the situation inappropriately and required them both to attend additional training.

**Count One – Violation of the Americans with Disabilities Act of 1990**

**Failure to Make Reasonable Modifications to Policies, Practices, and Procedures**

154.

At all relevant times, DeKalb County was a public entity subject to the requirements of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112 to 12117 ("ADA").

155.

At the time of the incident-in-suit, the Zadok was a qualified individual with a disability within the meaning of the ADA.

156.

Once Zadok had retreated into his home, he did not pose a "direct threat" within the meaning of the ADA and its implementing regulations, because any risk presented by his behavior could have been mitigated by means of reasonable accommodations.

157.

Zadok also did not pose a "direct threat" because he retreated into his home and did not come out to confront or threaten the officers. Instead, they came in to confront and threaten him.

158.

At all relevant times, DeKalb County operated the DeKalb County Jail, which its own former police chief called the largest mental health facility in the Southeast.

159.

More than 30,000 persons per year are incarcerated at the DeKalb County Jail, and at least 20% of them suffer from some form of mental illness.

160.

Most of those persons are placed in the Jail after being arrested by a DKPD police officer.

161.

Dekalb County was aware – long before April 2021 – that its police officers would have arrest encounters with thousands of citizens annually who were experiencing some form of mental illness.

162.

DeKalb County policymakers, including but not limited to the Board of Commissioners, the Chief Executive Officer, and the Chief of Police, have known since at least 2015 that DKPD did not provide its police officers adequate training and resources to recognize and de-escalate mental health crises in the course of performing an arrest. Defendant was deliberately indifferent to that unmet need.

163.

By failing to provide officers with adequate training and resources to recognize and de-escalate mental health crises when performing a custodial arrest, Defendant failed to make reasonable modifications to its policies, practices, and procedures that were necessary to avoid exposing persons with mental illness to an undue and disproportionate risk of bodily harm or death by reason of their disability.

33

164.

Defendant, through its policymakers, had actual knowledge of the need for such reasonable modifications to its policies, practices, and procedures, but deliberately ignored that unmet need.

165.

As a result of Defendant's deliberate refusal to make reasonable modifications to its policies, practices, and procedures, arrestees with mental illness, including Zadok, were exposed to a heightened risk of injury or death relative to other arrestees, by reason of their disability.

166.

For example, the use of de-escalation techniques has been shown to improve officer safety and decrease the likelihood of injury or death to an arrestee who is suffering a mental health crisis.

167.

Because Sergeant Perry was not adequately trained in how to recognize and de-escalate mental health crises, he directed the officers under his command to escalate the encounter by repeatedly kicking in Zadok's door and pointing weapons at him.

168.

Because Sergeant Perry was not adequately trained in how to recognize and de-escalate mental health crises, he even provocatively suggested to Zadok that he might be facing a fatal encounter, by telling Zadok that he didn't have to die today.

169.

At all relevant times, Defendant knew that it had placed Sergeant Perry in a position of authority that would require him to recognize and de-escalate mental health crises and command other officers in such situations.

170.

In addition, Defendant knew through its process of internal review that Sergeant Perry had previously shot and killed an armed suspect who was having a mental health crisis. The fact that Perry had previously experienced such an incident in the course of duty showed that he needed adequate training to handle such situations.

171.

Defendant did not give Sergeant Perry adequate training to recognize and de-escalate mental health crises.

172.

Because Defendant failed to provide Sergeant Perry with adequate training, his poor decisions foreseeably caused Zadok to be shot and killed.

173.

Defendant, through its IRB, ratified Perry's actions and found that Perry acted in accordance with Defendant's policies.

174.

Even though the IRB found that Sergeant Perry acted in accordance with policy, it also found that he needed additional training in critical incident command.

175.

Besides failing to provide adequate training, Defendant also failed to adopt policies, practices, and procedures to provide adequate guidance and support to a responding officer who is not trained to de-escalate a mental health crisis.

176.

Defendant had information that Zadok lived at his address and needed mental health services, because Zadok had called DeKalb 911 less than a month earlier from his townhome and had reported that he was being stalked by the police and needed the FBI. But Defendant did not have any policies, practices, or procedures to follow up on unresolved calls involving a mental health crisis, or even record them, so that

36

an appropriate team could be dispatched to later calls for service at the same address. As a result, Defendant did not make any use of the information in its possession about the prior incident.

177.

Defendant did not staff the MCU sufficiently to respond to mental health crises on all shifts and in all precincts, as the CIT model requires. The MCU never responded to this incident, despite Perry's statement that he requested that unit.

178.

After Zadok shut himself into his townhome, Defendant's written policies required Sergeant Perry to call the SWAT team for assistance and wait for them to arrive with a trained negotiator.

179.

DKPD has adopted a policy promoted by the International Association of Chiefs of Police, among other major law-enforcement organizations, which requires an officer to call for specialized assistance when confronted with a "barricaded individual" (the "Barricaded Individual Policy").

180.

The Barricaded Individual Policy is designed to improve officer safety and decrease the likelihood of injury or death to officers and suspects alike.

37

181.

The Barricaded Individual Policy achieves these goals, in part, by slowing down the incident and reducing the need to make split-second decisions about use of force.

182.

The Barricaded Individual Policy also achieves its goals by ensuring that a negotiator with training in de-escalation responds to the scene.

183.

Further, the Barricaded Individual Policy helps ensure that any forcible arrest is carried out by trained tactical personnel.

184.

DKPD's Barricaded Individual Policy requires the SWAT team to be called in to handle barricaded-individual situations.

185.

Calling SWAT would have de-escalated the situation, because Perry would have been required to secure the perimeter and wait for SWAT to arrive.

186.

Calling SWAT would have ensured that the situation was handled by personnel with appropriate negotiation and tactical training.

187.

Sergeant Perry did not call SWAT until over 30 minutes after he had shot Zadok.

188.

Defendant, through its IRB, ratified Perry's decision not to call SWAT.

189.

Defendant, through its IRB, found that Perry acted in accordance with Defendant's official policies in all respects.

190.

Providing its officers with adequate training and resources to recognize and de-escalate mental health crises during arrests would not fundamentally alter the activities of the DKPD.

191.

Providing officers with adequate training and resources to recognize and de-escalate mental health crises during arrests would not impose an undue cost or burden on Defendant.

192.

Providing officers with adequate training and resources to recognize and de-escalate mental health crises during arrests would not place officers at added risk, but instead would make them safer.

193.

As a foreseeable result of Defendant's deliberate indifference to the need for reasonable modifications to its policies, practices, and procedures as described above, Zadok suffered personal injury, pain and suffering, and death.

194.

Defendant is liable to Plaintiff for compensatory damages resulting from its deliberate indifference and that of Sergeant Perry, to include damages for personal injuries, pain and suffering, and wrongful death.

**Count Two – Violation of the Americans with Disabilities Act of 1990**

**Failure to Provide Reasonable Accommodations**

195.

The ADA requires a public entity to make reasonable accommodations for a qualified individual's known disability.

196.

At the time of the incident-in-suit, Zadok was a qualified individual with a disability within the meaning of the ADA.

197.

At all relevant times, Lieutenant James, Sergeant Perry, and the officers under Perry's command acted in the course of their official duties as agents and employees of Defendant.

198.

Once Zadok had retreated into his home, he did not pose a "direct threat" within the meaning of the ADA and its implementing regulations, because any risk presented by his behavior could have been mitigated by means of reasonable accommodations.

199.

Zadok also did not pose a "direct threat" because he retreated into his home and did not come out to confront or threaten the officers.

200.

At all relevant times, Sergeant Perry was aware that Zadok was experiencing a disabling mental health crisis.

201.

Zadok's words and behavior made it apparent to Sergeant Perry and the other officers that Zadok was experiencing a disabling mental health crisis.

202.

Sergeant Perry also knew that he did not have CIT training or other adequate specialized training to de-escalate Zadok's mental health crisis.

203.

Because Perry did not have adequate training to de-escalate a mental health crisis, and because he knew that Zadok was experiencing a mental health crisis, Perry should have called for the assistance of someone who had adequate training in order to accommodate Zadok's disability.

204.

Sergeant Perry did not request assistance from anyone with adequate de-escalation training until after he had fatally shot Zadok.

205.

Defendant specifically ratified Sergeant Perry's decision not to call for trained assistance.

206.

Although Zadok was not legally required to make a formal request for reasonable accommodations, he did so to the best of his ability in his state of mental health. Specifically, he repeatedly asked the officers to back off and lower their weapons, and to talk to him peacefully through the door.

207.

Sergeant Perry heard Zadok make these requests, but he ignored them.

208.

Zadok's requests were reasonable because, among other reasons, he was asking for nothing more than what DeKalb's Barricaded Individual Policy already required Perry to do.

209.

When Sergeant Perry arrived at the incident scene, Zadok was a "barricaded individual" within the meaning of DKPD's Barricaded Individual Policy.

210.

Because Zadok was a barricaded individual, Defendant's written policy required Sergeant Perry to call the DKPD Swat team for assistance in de-escalating the situation and taking Zadok into custody.

211.

Had Perry followed the Barricaded Individual Policy, after calling SWAT, he would have been required to hold the perimeter of the incident scene and wait for SWAT to arrive.

212.

Further, after calling SWAT, Perry would have been required to avoid confronting Zadok, escalating the situation, or initiating any tactical actions unless necessary to protect lives and safety.

213.

When DKPD's Internal Review Board later reviewed the incident, three of the seven voting members found that Perry violated policy by failing to de-escalate and by not calling SWAT in a timely manner.

214.

Defendant's official finding, however, was that Perry acted in accordance with policy.

215.

Zadok's requests also were in accordance with CIT training. The "Ten Commandments of De-Escalation," as described in the State of Georgia's CIT Training Manual, state that officers attempting to de-escalate a mental health crisis

should, among other things: (1) respect personal space; (2) refrain from provocative behavior; and (3) establish verbal contact.

216.

Zadok's requests that Perry give him space, stop pointing weapons at him, and talk peaceably were reasonable accommodations for Zadok's mental-health disability in the circumstances.

217.

Defendant's officers refused to provide any of these accommodations.

218.

Instead, Defendant's officers did the opposite: at Perry's command, they broke open the Zadok's door, pointed and fired guns and a Taser at him, and spoke in loud, agitated voices that created a "fight-or-flight" atmosphere.

219.

The inappropriate behavior of Perry and Defendant's other officers increased Zadok's fear of the officers and decreased the likelihood that he would put down the knife.

220.

By refusing the requested accommodations, and by instead ordering a plan that involved repeatedly kicking in Zadok's door and threatening Zadok with lethal

and less-lethal weapons, Perry unnecessarily forced a confrontation that made himself, his officers, and Zadok less safe.

221.

As a foreseeable result of Perry's deliberate indifference to the need for reasonable accommodations, Zadok suffered personal injury, pain and suffering, and death.

222.

Defendant is vicariously liable for Perry's failure to make reasonable accommodations for Zadok's disability because Perry acted under Defendant's authority, on Defendant's behalf, and pursuant to Defendant's policies.

223.

Defendant is liable for Perry's failure to make reasonable accommodations for the Zadok's disability because Defendant ratified Perry's actions by finding that Perry acted in accordance with official policy.

224.

Defendant is liable for Perry's failure to make reasonable accommodations because Perry's conduct was a foreseeable result of Defendant's own failure to make modifications to its own policies, practices, and procedures as alleged in Count One, above.

225.

Defendant is liable to Plaintiff for compensatory damages resulting from its deliberate indifference and that of Sergeant Perry, to include damages for personal injuries, pain and suffering, and wrongful death.

**Count Three: Violations of Section 504 of the Rehabilitation Act of 1973**

226.

At all relevant times, Defendant was a recipient of federal funds and was subject to the requirements of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

227.

At the time of the incident in suit, Zadok was a qualified individual with a disability within the meaning of the Rehabilitation Act.

228.

The facts alleged in Counts One and Two above are incorporated into this Count as if fully alleged herein.

229.

Defendant is liable to Plaintiff for compensatory damages resulting from its deliberate indifference and that of Sergeant Perry, to include damages for personal injuries, pain and suffering, and wrongful death.

**Count Four: Attorneys' Fees and Expenses of Litigation**

230.

Because of Defendant's violations of Zadok's rights under the ADA, Plaintiffs are entitled to an award of costs and reasonable attorneys' fees under 42 U.S.C. § 12205.

231.

Because of Defendant's violations of Zadok's rights under the Rehabilitation Act, Plaintiffs are entitled to an award of costs and reasonable attorneys' fees under 29 U.S.C. § 794a.

WHEREFORE, Plaintiffs respectfully request the following relief:

(a)     That the Court award Plaintiffs compensatory damages against the Defendant in an amount to be determined by the enlightened conscience of an impartial jury;

(b)     That the Court grant Plaintiffs their reasonable costs and attorneys' fees in bringing this action in an amount to be determined at trial;

(d)     That Plaintiffs be granted a trial by jury on all issues so triable; and

48

(e)    That Plaintiffs be granted such other and further relief as this

Court deems just and proper.

This 17th day of February, 2023.

Respectfully submitted,

*s/Mawuli M. Davis*
Mawuli M. Davis
Georgia Bar No. 212029

*s/Harold W. Spence*
Harold W. Spence
Georgia Bar No. 671150

**THE DAVIS BOZEMAN LAW FIRM, P.C.**
4153-C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
Phone: 404.244.2004
Facsimile: 404.244.2020
Email: mdavis@davisbozemanlaw.com
        hspence@davisbozemanlaw.com

*s/ Leighton Moore*
LEIGHTON MOORE
Georgia Bar No. 520701

**THE MOORE LAW FIRM, PC**
1819 Peachtree Street NE
Suite 403
Atlanta, Georgia 30309
Phone: 404-285-5724
Facsimile: 404.244.2020
Email: leighton@moorefirmpc.com

*Attorneys for Plaintiffs*