IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HAHNAH WILLIAMS and
CHRIS ANN LEWIS,

      Plaintiffs,

v.

DEKALB COUNTY, GEORGIA,

      Defendant.

CIVIL ACTION FILE

NO. 1:23-cv-738-TCB

# O R D E R

This case comes before the Court on Defendant DeKalb County,

Georgia's motion [11] to dismiss Plaintiffs Hahnah Williams and Chris

Ann Lewis's amended complaint for failure to state a claim.[1]

## I.   Background

This action stems from the fatal shooting of Matthew Zadok

Williams by Sergeant Devon Perry, a DeKalb County police officer.

---

[1] DeKalb County's initial motion to dismiss [8] was directed toward the original complaint. In response to the motion, an amended complaint [10] was filed. The initial motion [8] is therefore denied as moot.

On April 12, 2021, DeKalb County police officers responded to a call about a man—Williams—who was wandering in the woods and had pulled a plumber's knife out in the presence of the caller. When the officers arrived, Williams was sitting on the deck of his townhouse with the knife.

One of the two responding officers told Williams that if he did not live there, he would have to leave the property. Williams followed the officer and then ran toward him with the knife. The officer stumbled, and Williams ran away. The other responding officer fired a shot at Williams, but Williams gave no indication that he had been shot.

When Perry arrived, he became the commanding officer. At that point, Williams had broken a window and entered his townhouse. The townhouse door was locked, and officers had both the front and the back doors covered. Perry called his superior officer, Lieutenant James, who authorized him to force entry to the townhouse.

Perry approached Williams's door with his gun drawn and announced his presence. After one officer knocked on the door, another officer kicked the door open. Williams dropped to the floor, hid behind furniture, and closed the door. The officers kicked the door back open,

and Perry fired a shot at Williams. Williams moved furniture to block
the door and moved closer to the door. He asked the officers to put their
guns down so he could talk to them.

Every time the officers kicked the door open, Williams shut it
again. When Williams was attempting to shut the door for the fifth
time, Perry fired three shots through the door as it was closing,
shooting Williams. Williams ultimately died from his injuries.

Plaintiffs allege that Williams was suffering from a mental health
crisis at the time of the incident at issue. They contend that DeKalb
County acted with deliberate indifference in refusing to make
reasonable modifications to its policies and procedures related to
encounters with individuals with mental illness and that Williams was
therefore exposed to a heightened risk of injury or death.

Plaintiffs also contend that the County is liable for Perry's failure
to accommodate Williams's alleged disability. They contend that,
although its officers annually encounter thousands of individuals with
mental illnesses, DeKalb County has a history of mishandling mental
health crises. They allege that its officers are untrained in dealing with
individuals with mental illnesses. They further allege that DeKalb

County officers mishandled encounters with such individuals on three prior occasions and that DeKalb County has inadequately funded and implemented crisis intervention training and other programs for reorganizing and deescalating situations involving such individuals.

Plaintiffs further allege that the responding officers were aware that Williams had a mental illness and failed to properly handle his situation, that the scene was stabilized upon Perry's arrival, and that Williams was not a threat of immediate harm. They allege that Perry was not trained to deal with mental health crises, that he previously shot and killed a person experiencing a mental health crisis, that he knew Williams was experiencing a mental health crisis yet failed to accommodate him by not activating SWAT or utilizing crisis intervention techniques, and that Perry was thereby deliberately indifferent to Williams's rights.

Plaintiffs—Williams's estate administrator and his mother—have brought this action against DeKalb County pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, et seq. ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("RA"). Their first count alleges that the County failed to make reasonable

modifications to its policies and procedures related to police encounters with individuals with mental illnesses despite knowing of the need to do so and was therefore deliberately indifferent. Their second count alleges that the County is liable for the deliberate indifference of the officers who shot Williams.

DeKalb County has moved to dismiss the amended complaint, alleging that it fails to state a claim upon which relief can be granted for several reasons. Specifically, DeKalb County argues that (1) Plaintiffs fail to state cognizable claims under the ADA or RA because the exigent circumstances preclude a claim and because the Eleventh Circuit does not recognize vicarious liability claims under the ADA or RA; (2) Plaintiffs have failed to allege that Williams was a qualified individual with a disability; and (3) Plaintiffs have failed to sufficiently allege that DeKalb County acted with deliberate indifference.

## II.   Legal Standard

To survive a Federal Rule of Civil Procedure 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007); *see also Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012) (quoting *id.*). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted) (quoting *Twombly*, 550 U.S. at 556); *see also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324–25 (11th Cir. 2012).

Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555–56 (citations omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), the Court need not accept as true the plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678.

Accordingly, evaluation of a motion to dismiss requires two steps: (1) eliminate any allegations in the pleading that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

In addition to these generally applicable pleading standards, Rule 9(b) requires that a party alleging fraud or mistake "state with particularity the circumstances constituting fraud or mistake." This rule serves the dual purpose of ensuring that a complaint "alert[] defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)).

## III. Analysis

The ADA provides, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132. Similarly, the RA provides, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

Claims under these two statutes are governed by the same standards. *Ingram v. Kubik*, 30 F.4th 1241, 1256 (11th Cir. 2022) (citing *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019)). The Court interprets cases construing one statute as applicable to both.

To state a prima facie case under either statute, an individual must be (1) a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against by the entity, and (3) the exclusion, denial, or discrimination was because of his disability. *Id.* at 1256–57 (quoting *Silberman*, 927 F.3d at 1134). To recover compensatory damages from a public entity, the plaintiff must allege that the entity has engaged in intentional

discrimination, which requires a showing of deliberate indifference. *Id.*
at 1257 (quoting *Silberman*, 927 F.3d at 1134).

### A.   Qualified Individual

DeKalb County argues that Plaintiffs have failed to allege that
Williams is a qualified individual with a disability. For purposes of the
ADA and RA, a disability is a "physical or mental impairment that
substantially limits one or more major life activities." 42 U.S.C.
§ 12101(1); 29 U.S.C. § 705(20)(B). And the RA defines a handicapped
person as "any person who (i) has a physical or mental impairment
which substantially limits one or more major life activities, (ii) has a
record of such an impairment, or (iii) is regarded as having such an
impairment." 34 C.F.R. § 104.3(j)(1).

To determine whether an impairment substantially limits a major
life activity involves consideration of the nature, severity, and duration
of the impairment along with the permanent or long-term impact.
*Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir.
1996).

DeKalb County contends that Plaintiffs' allegations of Williams's
disability are conclusory. The Court does not agree. Plaintiffs have

alleged that Williams was suffering an episode of mental illness and that DeKalb County's officers regarded him as mentally impaired. They allege that Williams's mental illness was disabling because it substantially limited thinking, a major life activity as defined by the ADA. 42 U.S.C. § 12102(2). Plaintiffs further allege that Williams's mental illness substantially limited his ability to communicate with the officers, and communication is also a major life activity. *Id.*

Plaintiffs have alleged that Williams's behavior was symptomatic of a disabling mental disorder and that Perry told the DeKalb County internal review board that he attempted to call the medical crisis unit ("MCU") on the way to Williams's home because he knew Williams was having a mental health crisis. The cases to which DeKalb County points are distinguishable in that those cases involve plaintiffs who did not allege a substantial limitation of a major life activity. *See, e.g.*, *Charles v. Johnson*, 18 F.4th 686, 703 (11th Cir. 2021).

The Court finds that Plaintiffs have sufficiently pleaded that Williams was a qualified individual with a disability.

## B.    Cognizable Claims

### 1.    General Applicability

As an initial matter, the parties dispute whether the Eleventh Circuit has settled the applicability of the ADA or RA to police officers.

In *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1084 (11th Cir. 2007) (quoting 42 U.S.C. § 12132), the Eleventh Circuit held that a plaintiff can "attempt to show a[] . . . claim under . . . Title II" by establishing "that he was 'subjected to discrimination' by a public entity, the police, by reason of his disability." From Plaintiffs' perspective, "the holding of *Bircoll* is that the ADA does support a claim for disability determination by police officers making an arrest. The question reserved in *Bircoll* was merely whether that claim arose under the 'programs, services or activities' part of the statutory text." [12] at 6 (emphasis removed) (citing 480 F.3d at 1284).

From DeKalb County's point of view, however, the court in *Bircoll* "examined the possibility of an ADA claim" but because it ultimately held that the plaintiff did not state such a claim, the Eleventh Circuit "left open the question about the viability of an ADA claim for police encounters with disabled individuals." [13] at 2–3 (emphasis removed).

DeKalb County points to *Estate of Osorio v. Miami-Dade County*, 717 F. App'x 957, 957 (11th Cir. 2018), in which the Eleventh Circuit stated, "This court has never addressed whether police officers can violate Title II of the ADA." Plaintiffs discount this case as an "unpublished panel opinion" that is "not precedent" and "incorrect[]" in "appear[ing] to have overlooked" *Bircoll.* [12] at 6 n.3.

DeKalb County also relies upon *Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir. 2022). In that case, one of the defendants argued that the ADA did not apply to police encounters. The Eleventh Circuit held that his argument "may conflict with precedent." *Id.* (citing *Bircoll*, 480 F.3d at 1084–85). However, the court ultimately determined that it "need not address that argument because . . . vicarious liability is unavailable under Title II." *Id.*

The Court is not persuaded by DeKalb County's reasoning on this issue. As Plaintiffs point out, other courts have held that *Bircoll* holds that Title II can apply to police activities such as arrests. *See, e.g.*, *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 988 (7th Cir. 2020); *Gray v. Cummings*, 917 F.3d 1, 16 (1st Cir. 2019); *Vila v. Miami-Dade Cnty.*, 65 F. Supp. 3d 1371, 1384 (S.D. Fla. 2014). The Court agrees with the

reasoning of those courts. *Bircoll*, from a plain reading, appears to allow, at a minimum, the possibility of an ADA or RA claim under the facts at issue. As Plaintiffs point out, *Estate of Osorio* is not precedential. And the Court is not persuaded that *Ingram* supports DeKalb County's position. In fact, although the issue was not decisive, the court there pointed to *Bircoll* as precedent that may foreclose an argument that the statutes do not apply in the context of police encounters. *Ingram*, 30 F.4th at 1257.

The Court thus concludes that Eleventh Circuit precedent may allow an ADA or RA claim to proceed with respect to police encounters.

## 2. Facts Pleaded

A separate question, however, is whether Plaintiffs have stated a claim for relief under the facts they have pleaded. DeKalb County argues that "the exigencies here make the alleged accommodations—lowering weapons and/or waiting for additional people specifically trained in handling mental health episodes—unreasonable as a matter of law." [13] at 4.

As the Eleventh Circuit stated in *Bircoll*,

In our view, the question is not so much one of the applicability of the ADA because Title II prohibits

discrimination by a public entity by reason of [an individual's] disability. The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance.

In other words, the question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety. The reasonable-modification inquiry in Title II–ADA cases is "a highly fact-specific inquiry."

480 F.3d at 1085. In *Bircoll*, the issue was whether officers should have accommodated the request of a deaf individual to have an oral interpreter present before he was required to take a field sobriety test. The court held that such a request was not reasonable under the circumstances.

In *Vila v. Miami-Dade County*, 65 F. Supp. 3d 1371 (S.D. Fla. 2014), the arrestee was running around in an agitated state in public while ignoring the officer's commands. The court held:

Here, Plaintiff's assertion that, in responding to Plaintiff's call for immediate help, the City should have anticipated the need for and waited for a Crisis Intervention Unit and officers specifically trained to deal with schizophrenic individuals, does not constitute a viable ADA claim. Officer Kelly responded to an emergency call for assistance, and found Mr. Vila behaving erratically and

14

refusing to respond to orders. The situation escalated, and Officer Kelly—assisted by Mr. Vila's father and other bystanders—ultimately subdued and arrested Mr. Vila. To force the police to delay a response to Plaintiff[']s call until a specialized unit was mobilized, or to require Officer Kelly to await specially trained backup while Mr. Vila became increasingly agitated and erratic, would have been both impractical and dangerous. Therefore, Plaintiff cannot state a claim that Mr. Vila was unreasonably denied an accommodation in the course of his arrest.

*Id.* at 1384.

Although the case law on this issue is sparse, the Court finds that the accommodations to which Plaintiffs contend Williams was entitled were not reasonable under the circumstances. Williams pulled out his knife in the presence of the person who called authorities. He had the knife in his possession when officers arrived, and he began following an officer, running toward him with the knife. Although he had reentered his townhouse, he hid and shut the door every time officers kicked it open, and the officers were aware that he had the knife in his possession.[2]

---

[2] Plaintiffs point to a statement from DeKalb County's police chief, public safety commissioner, and chief executive officer stating that every DeKalb County police officer should be trained in CIT de-escalation methods. From their perspective, this means that DeKalb County cannot establish as a matter of law that applying these methods would have been unsafe. The Court disagrees. That every officer should have been *trained* in these methods does not mean that the methods should necessarily have been *applied* in this circumstance. Part of that

Although Perry was inside his residence—a fact that weighs in Plaintiffs' favor and distinguishes this case from *Vila*—the Eleventh Circuit's holding in *Bircoll* dictates the Court's conclusion. The court there held that "waiting for an oral interpreter before taking field sobriety tests is not a reasonable modification of police procedures given the exigent circumstances of a DUI stop on the side of a highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity." 480 F.3d at 1086.

The Court agrees with DeKalb County that the facts in this case, even more strongly than those in *Bircoll*, demonstrate that the accommodations to which Plaintiffs refer were not reasonable under the circumstances. The County argues, "the officers were facing an erratic and dangerous man with a deadly weapon, who was noncompliant, not surrendering, and not listening to commands; the officers had to make

---

training would undoubtedly have involved knowing when de-escalation methods were appropriate to use.

Plaintiffs also point to allegations in their complaint that DeKalb County policy required Perry to activate the SWAT team to allow a trained negotiator to handle the situation; that Perry had time to do so; and that so doing would have made everyone safer. However, it strains credulity to think that a county could be held liable for an isolated occurrence of an individual failing to follow the policy the county had in place.

split-second decisions, whereby action or inaction could result in serious or deadly consequences." [11-1] at 10. Requiring officers to wait for a crisis intervention team or to put their weapons down "is impractical, dangerous, and would have put the officers' lives at risk." *Id.* The Court agrees.

Because the modifications to which Plaintiffs contend Perry was entitled were not reasonable as a matter of law under the circumstances, Plaintiffs' complaint will be dismissed.

### 3.    Count II

DeKalb County asserts that Count II is a vicarious liability claim for which it cannot be held liable. Plaintiffs do not dispute that the County cannot be held vicariously liable for any alleged indifference by Perry. However, they contend that Count II is not a claim for vicarious liability but instead a claim against DeKalb County for its official decisions made.

Count II alleges that DeKalb County failed to make reasonable accommodations. Plaintiffs allege that Perry was aware that Williams was experiencing a mental health crisis, knew he did not have adequate training to deal with the crisis, should have called for assistance but

failed to do so, heard Williams request an accommodation but ignored it, and was deliberately indifferent to Williams's request.

From DeKalb County's perspective, these allegations focus solely on Perry's actions or inactions and do not relate to its actions or knowledge, making it a vicarious liability claim.

From Plaintiffs' perspective, this is instead a claim against DeKalb County for the official decisions it made. A public entity is liable under Title II for the act of an official whom it vests with discretion to decide whether to provide an accommodation for a person's disability. *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 350 (11th Cir. 2012).

For DeKalb County to be held liable, Plaintiffs must point to an official with authority to correct the alleged discrimination who had actual knowledge of the discrimination and failed to adequately respond. *Silberman*, 927 F.3d at 1124. And that individual must "enjoy[] substantial supervisory authority within an organization's chain of command, so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Liese*, 701 F.3d at 350 (quoting *Doe v. Sch. Bd.*

*of Broward Cnty.*, 604 F.3d 1248, 1256–57 (11th Cir. 2010)). In other words, his decisions must not have been subject to reversal. *See id.* This is a "fact-intensive inquiry." *Id.*

The Eleventh Circuit has held that in certain circumstances doctors and schoolteachers could serve as such officials. *See id.*; *J.S. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 989 (11th Cir. 2017). On the other hand, the court has held that nurses were not such officials. *Liese*, 701 F.3d at 350. Nor were physical-education coaches considered to have substantial supervisory authority over a teacher's aide's activities. *J.S.*, 877 F.3d at 991. And bus drivers were not considered such officials. *Silberman*, 927 F.3d at 1136.

Plaintiffs contend that they have alleged that Perry was such an official, acting in his official capacity, making his acts the acts of DeKalb County; that DeKalb County gave Perry authority to make decisions on its behalf with respect to whether to provide accommodations at the scene; and that DeKalb County ratified Perry's decisions through its internal review board.

Certain allegations in the complaint support Plaintiffs' position. They have alleged that "Defendant's policies, including its chain-of-

19

command policy, vested Sgt. Perry with substantial supervisory authority so that, when dealing with [Williams] at the scene, Perry had authority and discretion to decide whether to make reasonable accommodations for [Williams's] mental health disability." [10] ¶ 219. They allege that DeKalb County "placed Sergeant Perry in a position of authority that would require him to recognize and de-escalate mental health crises and command other officers in such situations." *Id.* ¶ 180. And they have alleged that DeKalb County's "policies vested Sgt. Perry with authority and discretion to decide whether to call an adequately trained responder to manage [Williams's] mental-health crisis, or instead to attempt to apprehend [Williams] by deadly force." *Id.* ¶ 220.

On the other hand, certain allegations cut against such a finding. For instance, Plaintiffs allege that "Perry called his superior officer, Lieutenant James, who authorized Perry to force entry to the townhome." *Id.* ¶ 18. They further allege that "Perry contacted Lieutenant James and requested permission to make a forcible entry into [Williams's] home" and that "Perry specifically obtained authorization for his actions from his official supervisor, Lt. James." *Id.* ¶¶ 133, 221.

Based upon the totality of the facts as pleaded in the complaint, the Court finds that Plaintiffs have not alleged facts to show that Perry had "substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Liese*, 701 F.3d at 350 (quoting *Doe*, 604 F.3d at 1256–57). Instead, Plaintiffs plead that Perry requested—and received—approval from his supervisor, James. And Plaintiffs do not allege that Perry had authority over the Mobile Crisis Unit such that he could do more than request their services (as he did).

Ultimately, Plaintiffs have not alleged facts to demonstrate that Perry had complete discretion with respect to whether to provide the accommodations or discretion at the relevant decision points in the administrative process. Thus, Count II is subject to dismissal for this additional reason.[3]

---

[3] DeKalb County also contends that the knowledge of the wrongdoer himself—here, Perry—does not suffice. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998); *Doe II v. Savannah-Chatham Cnty. Pub. Sch. Sys.*, No. 21-13023, 2022 WL 3041276, at *4 n.4 (11th Cir. Aug. 2, 2022). Ultimately, the Court need not reach this issue. Plaintiffs' motion [14] for leave to file a surreply with respect to this issue will therefore be denied as moot.

### C.   Deliberate Indifference

As stated above, for Plaintiffs to prevail on a claim for monetary damages under the ADA or RA, they must show that the violation was the result of intentional discrimination, which requires a showing of deliberate indifference. *Liese*, 701 F.3d at 344. Specifically, Plaintiffs must show that DeKalb County knew of, yet failed to act on, the substantial likelihood of harm to a federally protected right. *Id.* Deliberate indifference requires a deliberate choice, more than gross negligence. *Id.* Plaintiffs also must point to an official who had authority to address the alleged discrimination and to institute corrective measures on the county's behalf and actual knowledge of discrimination in its programs yet failed to adequately respond. *Ingram*, 30 F.4th at 1257.

Plaintiffs appear to argue that DeKalb County is liable based on (1) Perry's own actions, and (2) failure to train.

### 1.   Perry's Alleged Deliberate Indifference

Plaintiffs contend that Perry's own deliberate indifference suffices to hold DeKalb County liable. For the reasons discussed above, the Court does not find that, based on the allegations in the complaint,

Perry's actions with respect to Williams constitute deliberate indifference. Indeed, several of Plaintiffs' own allegations cut against such a finding. For example, Plaintiffs allege that Perry requested that dispatch call the MCU but the MCU did not respond; Perry made forcible entry to check on Williams's status because another officer had shot at Williams; Perry sought authorization to enter the home before he did so; non-lethal force was attempted first; and Perry was found to have not violated any DeKalb County policy.

Further, Plaintiffs have not alleged that any specific high-ranking official knew of discrimination by Perry, made decisions about which officers received crisis training or when they received such training, knew that Perry was untrained, or knew of and deliberately chose not to address Williams's mental illness.

And to the extent Plaintiffs rely on Perry's previous alleged single incident of shooting and killing a suspect who was having a mental health crisis, the Court is not persuaded. A pattern must be pervasive; a single violation does not suffice. *See Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011). Plaintiffs acknowledge that the individual in the previous incident was armed and do not allege facts to establish

that that incident involved a qualified individual with a disability or that Perry acted in a way to violate that individual's rights.

Finally, DeKalb County's alleged ratification of Perry's acts when the Internal Review Board found his actions did not violate County policy does not establish deliberate indifference. Plaintiffs point to no other examples of DeKalb County consciously disregarding discriminatory behavior (the three examples mentioned in the amended complaint do not include allegations that DeKalb County disregarded any discrimination or violations), and isolated incidents fail to establish official policy or custom. *McDowell*, 392 F.3d at 1290.

The Court finds no deliberate indifference based on Perry's actions.

### 2. Failure to Train

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Generally, a pattern of similar constitutional violations by untrained employees is necessary for deliberate indifference for purposes of failure to train. *Estate of Schultz*, 554 F. Supp. 3d at 1280. However, in a "narrow range of

circumstances," such a pattern may not be necessary. *Id.* (quoting *Connick*, 563 U.S. at 62–63).

That narrow range of circumstances exists when the need for training is so obvious that failure to provide it amounts to deliberate indifference. *Weiland*, 792 F.3d at 1329. Alternatively, budget or staffing decisions must have been so obviously inadequate as to be substantially likely to result in the particular injury Williams suffered. *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004).

Plaintiffs argue that both apply.

### a.    Pattern of Similar Violations

In their amended complaint, Plaintiffs point to three prior incidents: (1) a 2015 incident in which a police officer shot and killed an unarmed veteran, Anthony Hill; (2) a 2017 incident in which an officer allegedly used excessive force against a homeless woman, Katie McCrary; and (3) a 2017 incident in which an officer shot and killed a veteran, Quintas Harris.

From DeKalb County's perspective, these three incidents do not establish a widespread pattern of disability discrimination in 2021. Plaintiffs have not pleaded that DeKalb County has been found liable

for any misconduct related to any of these incidents. The incident involving McCrary did not result in a shooting or a death. The officer who shot Hill was criminally prosecuted, but the Court granted summary judgment to DeKalb County in that case with respect to failure to train. *Giummo v. Olsen*, No. 1:15-cv-3928-TCB, 2019 WL 13043039, at *8–9 (N.D. Ga. June 4, 2019). And the officer sued in connection with the shooting of Harris was granted qualified immunity; the Eleventh Circuit Court of Appeals held that the officer did not violate the Fourth Amendment in firing the shot. *Harris-Billups v. Anderson*, 61 F.4th 1298, 1305 (11th Cir. 2023).

DeKalb County further contends that there is no indication that the three individuals involved in the earlier incidents had an ADA-recognized disability, that the officers were inadequately trained, or that the officers' actions related to any purported disability.

Ultimately, the Court finds that the three prior incidents were not sufficiently similar to the one at issue here to have put DeKalb County on notice of the need for further training, resources, and policies related to encounters with individuals with a mental illness. *See Connick*, 563 U.S. at 63.

26

## b.  Narrow Range of Circumstances

Plaintiffs also contend that this case is one of the rare instances in which direct evidence exists that high-level decisionmakers knew of the problem yet "deliberately chose a training problem which would prove inadequate." *See Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985). Specifically, Plaintiffs contend that they have alleged that DeKalb County's policymakers had actual awareness of the need to provide training and support to officers to de-escalate and manage mental-health crises, yet failed to do so.

Plaintiffs' amended complaint contains allegations with respect to the number of people with a mental illness in DeKalb County Jail after being arrested by DeKalb County police officers such that all Sheriff's Office employees who interacted with arrestees at the jail were required to be CIT trained as of 2017. They also allege that in 2015—after the shooting of Hill—DeKalb County's public safety commissioner stated that he wanted all current and incoming officers to be trained in CIT, and that in 2017—after the incident involving McCrary—DeKalb County's CEO endorsed the same approach and stated that he would request funding for it from the county commission.

Plaintiffs contend that they have plausibly alleged that despite this, DeKalb County made only a token response rather than any good-faith efforts. The amended complaint alleges that the funding requested and allocated did not suffice to accomplish the stated goal and that some of the funds were diverted to other ends.

Plaintiffs further allege that although training was not completed, the county commission ceased funding in 2020, supporting a fair inference that policymakers deliberately chose to defund the incomplete training effort.[4] Plaintiffs contend that DeKalb County could have ensured deployment of trained personnel through means such as a specialized CIT unit, SWAT, or MCU.

The Court is not persuaded by Plaintiffs' contentions. Although Plaintiffs allege that DeKalb County's training was not perfect, the Court does not find that the allegations rise to the level of deliberate

---

[4] Plaintiffs also allege that in fiscal years 2020 and 2021, DeKalb County's CEO requested hundreds of thousands of dollars for the DeKalb County Community Health Board (which provides public mental health services including the MCU) but the County Commission approved no increase. They contend that additional staffing was feasible because in 2022—the year after the incident at issue—DeKalb County used federal money to hire three additional nurses for the MCU. As DeKalb County points out, however, amended complaint alleges that the additional staffing resulted from federal funding, not funding from DeKalb County itself.

indifference, e.g., that DeKalb County deliberately chose an inadequate training program or was so obviously inadequate that the alleged violation at issue was likely to occur.

As DeKalb County points out, the complaint's allegations demonstrate that most officers were trained in crisis intervention by 2017 with funds for training added to the budget in 2018–19. And the county funded and staffed the Mobile Crisis Unit between 2018 and 2021.[5]

To the extent the argument is that DeKalb County was deliberately indifferent for not training every officer in CIT by 2021, this does not suffice to fall within the single-incident liability range. Plaintiffs have not pointed to any authority to show that failure to train

---

[5] DeKalb County contends that the same allegations entitle it to dismissal on another basis. Good-faith attempts to pursue legitimate ends do not suffice to support an award of compensatory damages under the ADA or RA. *J.D.P. v. Cherokee Cnty.*, 735 F. Supp. 2d 1348, 1364 (N.D. Ga. 2010) (quoting *Wood v. Pres. & Trs. of Spring Hill Coll.*, 978 F.2d 1214, 1219 (11th Cir. 1992)). DeKalb County contends that Plaintiffs' allegations demonstrate that from 2015 forward, it made legitimate efforts to increase training and resources for handling individuals with mental illness. The Court agrees.

And the Court is not persuaded by Plaintiffs' contention that the County ceased funding officer training altogether in 2020. The amended complaint alleges that fifty-one percent of officers were trained in CIT in October 2017 with $150,000 allocated in both 2018 and 2019 for CIT training. The allegation that no additional money was allocated after 2019 does not necessarily support Plaintiffs' contention that funding ceased or that it defunded the training effort.

every officer is so obvious as to put it on notice of deficiencies. In fact, the authority tends to show the opposite. *See, e.g.*, *Weiland*, 792 F.3d at 1339; *Schultz*, 554 F. Supp. 3d at 1280–81 (determining that lack of training was not obvious when eighteen of eighty-nine officers had received CIT training); *cf. Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285, 1325 (S.D. Fla. 2020) (holding that failure to provide any training at all, a "highly specific (and unlikely) scenario," on the use of deadly force constitutes obvious failure to train).

The Court therefore concludes that Plaintiffs have failed to plead facts to support an allegation of deliberate indifference by DeKalb. On this additional basis, their complaint—which seeks only monetary damages—will be dismissed.

## IV.  Conclusion

For the foregoing reasons, DeKalb County's motion [11] to dismiss is granted. DeKalb County's initial motion [8] to dismiss is moot, as is Plaintiffs' motion [14] for leave to file a surreply. Because the Court has ruled on the motion to dismiss, the motion [9] to stay is also moot.

The Clerk is directed to close this case.

IT IS SO ORDERED this 21st day of September, 2023.

Timothy C. Batten, Sr.
Chief United States District Judge