# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **Hahnah Williams, as Administrator of the Estate of Matthew Zadok Williams, and CHRIS ANN LEWIS, as mother and heir to the Estate of Matthew Zadok Williams,** | * * * * * * | **Civil Action No.: 1:23-cv-0738-TCB** |
| **Plaintiffs,** | * * | |
| **v.** | * * | **Jury Trial Demanded** |
| **DEKALB COUNTY, GEORGIA, a Political Subdivision of the State of Georgia,** | * * * * | |
| **Defendant.** | * | |

## PLAINTIFFS' NOTICE OF APPEAL

Notice is hereby given that Plaintiffs appeal to the United States Court of Appeals for the Eleventh Circuit from the final order (Doc. 16) and judgment (Doc. 17) of the District Court entered in this action on September 21, 2023. The circuit court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

Respectfully submitted, this 12th day of October, 2023.

*[Signature on following page]*

1

THE MOORE LAW FIRM, PC      _s/ Leighton Moore_
1819 Peachtree Street NE      Leighton Moore
Suite 403      Georgia Bar No. 520701
Atlanta, GA 30309
Phone: 404-285-5724
leighton@moorefirmpc.com

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

I hereby certify that the foregoing document is prepared in 14-point Times New Roman font, and that I have this day electronically filed with the Clerk of Court the foregoing Notice of Appeal, using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

This 12th day of October, 2023.

<u>*s/ Leighton Moore*</u>
Georgia Bar No. 520701

## EPIGRAPH

"The poorest man may in his cottage bid defiance to all the forces of the Crown.  It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter — all his force dares not cross the threshold of the ruined tenement!"

Remarks by William Pitt in a meeting of Parliament, March, 1763, *quoted in Miller v. United States*, 357 U.S. 301, 307 (1958).

Power is a heady thing; and history shows that the police acting on their own cannot be trusted.

*McDonald v. United States*, 335 U.S. 451, 456 (1948).

## PRELIMINARY STATEMENT

At stake in this civil rights action is one of the most fundamental liberties guaranteed both at common law and under the United States Constitution: the sanctity of the home and its curtilage. With a few narrow exceptions – none of which exist here – the police must obtain a warrant from a neutral magistrate before they can invade a person's liberty or privacy within the boundaries of his home. Without that warrant, those boundaries are closed to them. They can ask for voluntary cooperation, but if the resident refuses to oblige, they have no right to compel him, and they certainly cannot shoot him.

Defendants trampled on these basic liberties. They came to the home of John Harley Turner, without a warrant, to investigate an already-completed incident that

involved, at most, a resident using overly strong language to scare off some unwanted coon-hunters. When Harley met the Defendants at the gate of his home and refused to disarm himself or to let them into his yard, they did not go before a neutral magistrate to obtain a warrant for his arrest. Instead, they detained him at gunpoint in his yard for well over half an hour, while they concocted a military-style operation to take him down. Two Georgia State Patrol officers, armed with rifles, took up sniper positions, and two Sheriff's deputies crossed the fence in the dark and hid behind a hedge with twelve-gauge shotguns. While the remaining deputies distracted Harley, one of the hidden deputies fired his shotgun, dropping Harley to the ground with a "less lethal" shot-filled beanbag. Harley drew his weapon and fought back, and the officers shot him dead.

The Pickens Sheriff's Office Defendants now ask this Court to dismiss the Complaint in its entirety, contending that these allegations somehow do not state a claim for a deprivation of Harley's clearly established constitutional rights. And because they cannot show compliance with the warrant requirement, they try to bootstrap their way into an exception. The Deputies attempt to characterize their initial encounter with Harley as a detention upon reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1964), and then argue that Harley's refusal to cooperate created probable cause to arrest him for obstruction of their *Terry* stop. Even that first step of the Deputies' argument ignores clearly established law, but moreover,

the argument also ignores the fact that probable cause is a predicate for **obtaining** a warrant, not for dispensing with one. To perform a warrantless arrest in the home or its curtilage, Defendants would have to show both probable cause **and** exigent circumstances, which they cannot do — certainly not at the pleading stage.

The Deputies also argue that their use of deadly force was reasonable as a matter of law because Harley returned fire **after** being shot down with the beanbag round. But this argument misses the point, because Defendants had no reasonable basis to start the firefight at all. Harley had a pistol; but the Complaint alleges — and this Court therefore must assume — that the gun was holstered during most of the encounter and that Harley never threatened the officers with it or pointed it at them. Far from perceiving Harley as an immediate threat, the officers had been talking to him for more than half an hour and had just allowed him to walk all the way back to his cabin, where they could not see he was doing. Indeed, when Defendant Travis Palmer Curran fired the opening shot, Harley was standing inside the gate of his yard holding a flashlight in one hand and a jug of water in the other, and he had just told the officers that he wanted to go to bed. To say the least, these allegations do not carry Defendants' heavy burden of showing exigent circumstances for a violent warrantless seizure within the curtilage of the home. Finally, Sheriff Craig contends that he was not on notice of the need to train his officers regarding the constitutional warrant requirement and the lawful use of

force, but this argument fails because the need to train on these subjects is obvious

as a matter of law. The fact that **six** of Sheriff Craig's deputies participated in a

planned shooting of a citizen within the curtilage of his home, without **one** of them

so much as suggesting that a warrant should be obtained, raises a reasonable

inference of inadequate training.

For the above reasons, and as set forth more fully below, this Court should

deny the Pickens Sheriff's Office Defendants' Motion to Dismiss (Doc. 21).

### STATEMENT OF MATERIAL ALLEGATIONS

It is well established that, on a Defendant's Motion to Dismiss pursuant to

Rule 12(b)(6), the Court must accept the Plaintiff's allegations as true, construe

them most favorably to the Plaintiff, and draw all reasonable inferences in the

Plaintiff's favor. *Edwards v. Prime*, *Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010);

*Shands Teaching Hosp. & Clinics*, *Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1310

(11th Cir. 2000). Viewing the allegations of the Complaint in that light, the crucial

facts here are as follows.

The first group of Defendants here are six current or former deputies of the

Pickens County Sheriff's Office: Sgt. Travis Palmer Curran, a/k/a Travis Lee

Palmer; Deputy Frank Gary Holloway; Deputy Keelie Kerger; Deputy Bill

Higdon; and Deputy Todd Musgrave. Second is Sheriff Craig himself, against

whom liability is alleged for failure to train his Deputies in the basic constitutional

rights they are sworn to uphold. The third group are two Georgia State Patrol officers, Salcedo and Curtis, who have filed a separate Motion to Dismiss (Doc. 7).

On October 24, 2015, Deputies Holloway, Kerger, and Higdon responded to a 9-1-1 call for an already-completed incident involving allegations that a resident had accused some hunters of trespassing and had scared them away from his property by threatening to harm them. (Doc. 1, ¶¶ 22, 24.) The hunter who reported the incident had safely left the property, and he waited while the Deputies drove to meet him. (*Id.*, ¶¶ 23-25.) After getting his story, the Deputies drove to 1607 Carver Mill Road, Pickens County, Georgia. (*Id.*, ¶ 25.)

John Harley Turner ("Harley") lived at 1607 Carver Mill Road in a small house behind the main house, which was occupied by Harley's mother, Janet Turner O'Kelley, and her husband, Stan O'Kelley. (*Id.*, ¶ 26.) The O'Kelley and Turner houses were enclosed in a fence with a closed gate that blocked the driveway. (*Id.*) When the Deputies arrived at about 9:00 p.m., they spoke briefly with Stan O'Kelley, who told them his stepson Harley was the one who had been reported, and that Harley was armed. (*Id.*, ¶ 28.) There was no crime in progress at that time. (*Id.*, ¶ 27.)

As the officers spoke with Mr. O'Kelley, Harley approached the gate from the back house. (*Id.*, ¶ 29.) He was shirtless and armed with a pistol with a chest holster. (*Id.*) Harley was talking loudly about trespassing as he approached, but he

did not point the gun at anyone and did not threaten anyone with the gun. (*Id.*) He did not open the gate. (*Id.*) Shouting and with guns raised, the Deputies ordered Harley to put his hands up and put his gun down. (*Id.*, ¶ 30.) They did not identify themselves as law enforcement, and Harley referred to them as trespassers. (*Id.*)

At approximately that time Deputy Todd Musgrave arrived, followed immediately by Deputy Travis Curran. (*Id.*, ¶ 31.) Deputy Musgrave carried a shotgun. (*Id.*) Deputy Curran had two shotguns, one of which was loaded with "less lethal" beanbag rounds. (*Id.*) Two Georgia State Patrol officers, Jonathan Salcedo and Rodney Curtis, also arrived at about that time, armed with rifles, and took up sniper positions. (*Id.*)

At that point, Harley tried to terminate the encounter by walking back from the gate to his house. (*Id.*, ¶ 32.) The Deputies shouted at him to put the gun down and get on the ground. (*Id.*) Harley told them to just keep trespassers off his property, and tried to walk away again. (*Id.*, ¶ 33.) The Deputies, still pointing guns at his back, ordered him to come back to the fence. (*Id.*)

Around 9:05 p.m., Janet Turner O'Kelley arrived at the property. (*Id.*, ¶ 34.) She had been away for the evening, volunteering at a local community theater. (*Id.*) Ms. O'Kelley saw that Curran had a shotgun, and she told the officers that there should be no shooting and that Harley would defend himself if they opened fire. (*Id.*) The deputies would not let Ms. O'Kelley talk to Harley, but sent her back

9

down the driveway towards her vehicle. (*Id.*) They had previously sent Stan into a neighbor's house to get him out of the way. (*Id.*)

For approximately the next half-hour, the officers attempted to get Harley to put his gun down while Harley walked back and forth, wearing his gun in a chest holster and arguing that he simply wanted the officers to keep trespassers away from his property, and he wished they all would leave so that he could go to bed. (*Id.*, ¶ 35.) Harley was distressed and perceived the Deputies as threatening him. (*Id.*, ¶ 36.) However, he never verbally threatened or pointed the gun towards the Deputies. (*Id.*, ¶ 37.) At one point, he offered them a drink of water. (*Id.*)

At no point did Harley open the gate or leave the area within the fence that surrounded the O'Kelley and Turner residences. (*Id.*, ¶ 38.) He remained within the curtilage of his dwelling at all relevant times. (*Id.*, ¶ 49.) At no point did any of the officers obtain a warrant of any kind, or even discuss getting a warrant. (*Id.* , ¶ 38.)

At about 9:12 p.m., Deputies Curran and Higdon indicated that they were going to go quietly around the side of the driveway to "try to get a better position" so they could take shots at Harley. (*Id.*, ¶ 39.) This required them to cross the fence and take cover in a second driveway, also on the O'Kelley property. (*Id.*) This driveway ran roughly parallel to (and a few feet lower than) the one where Harley was standing. (*Id.*) The two driveways were separated by a hedge and a small embankment. (*Id.*)

Harley told the deputies that he was tired and wanted to go to bed, and that he was going to his cabin to get a drink of water. (*Id.*, ¶ 40.) This time, the officers did not stop him; true to his word, he returned from his cabin with a flashlight in one hand and a jug of water in the other. (*Id.*, ¶ 41.) He did not bring with him the SKS rifle that was under the bed in his cabin. (*Id.*) His pistol was holstered. (*Id.*) He pointed out to the officers that he was not the aggressor here, and told them that they were trespassing while he had never crossed the fence line. (*Id.*, ¶ 41.) He told them that he was tired and wanted to go to bed. (*Id.*)

While Harley was getting his water jug, however, Curran and Higdon had crossed the fence and gotten into position in the lower driveway with their shotguns. (*Id.*, ¶ 40.) Curran urged Deputy Kerger to draw Harley closer to the fence, which she did by approaching Harley unarmed and inviting him to come talk with her. (*Id.*, ¶ 42.) Deputy Musgrave covered Kerger during this operation. (*Id.*, ¶ 57.) The Deputies did this for the purpose of drawing Harley into a spot where Curran could get a good shot at him. (*Id.*, ¶ 58.)

When Harley approached the fence to talk, Curran fired three rounds from a twelve-gauge shotgun loaded with shot-filled beanbags, striking Harley with at least one round. (*Id.*, ¶ 43.) Harley returned fire, and the other deputies and GSP officers shot him dead. (*Id.*, ¶ 43-44.)

This action is brought by Janet Turner O'Kelley, individually and as Personal Representative of the Estate of John Harley Turner, and John Allen Turner (collectively "Plaintiffs"). Plaintiffs seek recovery for (1) the warrantless and illegal seizure of John Harley Turner within the curtilage of his home by Defendants Curran, Higdon, Holloway, Musgrave, Kerger, Salcedo, and Curtis; (2) the failure of Sheriff Craig to train his Deputies to follow constitutional arrest procedures, including the Fourth Amendment's warrant requirement and the constitutional limitations on the use of force; (3) the wrongful death of John Harley Turner; (4) the deprivation of Turner's constitutional rights to life and liberty; and (5) an award of costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988. (*Id.*, ¶¶ 45-77.)

## ARGUMENT AND CITATION TO AUTHORITY

Plaintiffs' Complaint states a claim upon which relief may be granted against all of the Pickens Sheriff's Office Defendants.

### I.    The Deputies are not entitled to qualified immunity.

The Deputies' contention that they enjoy qualified immunity for their warrantless and illegal seizure of Harley Turner is entirely without merit. The Deputies here had no warrant, no consent, and no exigent circumstances to justify a warrantless seizure of the person within the curtilage. No valid *Terry* stop existed, both because the scope of the detention plainly exceeded that permissible under

12

*Terry* and because the law was clearly established on the date of the incident that officers in this Circuit could not make a *Terry* stop within the boundaries of the home. Any use of force at all in these circumstances was unlawful and excessive as a matter of law. All of the Deputies knew there was no warrant, but they still participated in the illegal seizure and failed to intervene to stop it. They are all liable, under both state and federal law, for the death of Harley Turner and for violations of his clearly established constitutional rights.

> **A.   Under clearly established law, the Deputies could not seize Harley in the curtilage of his home without either (1) a warrant, or (2) probable cause to arrest *plus* (a) consent or (b) exigent circumstances.**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment." *Payton v. New York*, 445 U.S. 573, 585 (1980); *see also United States v. Scheffer*, 463 F.2d 567, 574 (5th Cir. 1972) ("It is, of course, an elementary constitutional principle that police officers must go before a neutral government official and obtain a

search warrant before intruding into a private dwelling."). For this reason, the

Eleventh Circuit has held that

> It is a "'basic principle of Fourth Amendment law' that searches and
> seizures inside a home without a warrant are presumptively unreasonable."
> *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d
> 639 (1980). This basic principle is founded on "the very core" of the Fourth
> Amendment: "the right of a man to retreat into his own home and there be
> free from unreasonable governmental intrusion." *Id.* at 590, 100 S. Ct. at
> 1382 (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679,
> 683, 5 L. Ed. 2d 734 (1961)). The sanctity of the home is afforded special
> protection under the Fourth Amendment, such that "the reasons for
> upholding warrantless arrests in a public place do not apply to warrantless
> invasions of the privacy of the home." *Id*. at 576, 100 S. Ct. at 1375.

*Bashir v. Rockdale Cty*., 445 F.3d 1323, 1327 (11th Cir. 2006); *see Johnson v.*

*United States*, 333 U.S. 10, 17 (1948) (describing the warrant requirement as "one

of the most fundamental distinctions between our form of government, where

officers are under the law, and the police-state where they are the law").

It also is clearly established that the curtilage of a home receives the same

constitutional protection as the home itself. *Oliver v. United States*, 466 U.S. 170,

180 (1984) (holding that the curtilage of the home "has been considered part of the

home itself for Fourth Amendment purposes"); *United States v. Taylor*, 458 F.3d

1201, 1206 (11th Cir. 2006) ("The private property immediately adjacent to a

home is entitled to the same protection against unreasonable search and seizure as

the home itself."); *Gilmere v. Atlanta*, 774 F.2d 1495, 1501 (11th Cir. 1985)

(holding that the "firm line" of the warrant requirement "has been extended to include the surrounding curtilage of the home").

Although in some cases the scope of the curtilage can be unclear, *see generally United States v Dunn*, 480 U.S. 294, 301 (1987) (laying out a four-factor test for determining the scope of the curtilage), it is well settled that the areas at issue here are within the curtilage. *See Landers v. State*, 250 Ga. 808, 809 (1983) ("a driveway is properly considered within the curtilage of the dwelling it services"); *Bowman v. State*, 332 Ga. App. 407, 408 (2015) ("The yard immediately surrounding a dwelling falls within the curtilage of a home."). At any rate, the Complaint alleges that Harley remained within the curtilage of his dwelling at all relevant times, Doc. 1, ¶ 49, and that factual allegation must be taken as true at this stage of the litigation. *See United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983) ("What is curtilage is a question of fact.").

Because Harley remained within the curtilage of his home, he was entitled to the most robust protection available under the Fourth Amendment. In particular, the Deputies could not arrest him there on mere probable cause. Rather, the law as explained by the Eleventh Circuit is:

> a warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest *and* either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant.

*Bashir*, 445 F.3d at 1328 (emphasis in original). Because the Deputies undisputedly did not obtain a warrant, any violent seizure of Harley had to be justified not only by probable cause, but also either by consent or by exigent circumstances. *Id.* They cannot meet this standard.

**B.     The Deputies did not have consent.**

At various points in their argument, the Deputies contend that Harley did not own the property at 1607 Carver Mill Road, and that the actual owners (which Defendants claim to be Stan and Jan O'Kelley) had consented to their presence. This argument is irrelevant and legally and factually incorrect.

First, Defendants' contention that Harley did not have ownership interests in the 1607 Carver Mill Road property is legally irrelevant to his Fourth Amendment rights. "'[T]he Fourth Amendment protects people, not places,' *Katz v. United States*, 389 U.S. 347, 351 (1967), and wherever an individual may harbor a reasonable 'expectation of privacy,' *id*., at 361 (Mr. Justice Harlan, concurring), he is entitled to be free from unreasonable governmental intrusion." *Terry v. Ohio*, 392 U.S. 1, 9 (1968). Indeed, even "a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California*, 376 U.S. 483, 490 (1964); *see also McDonald*, *supra* (same, as to a boarding house). The relevant fact therefore is not who owned the property at 1607 Carver Mill Road, but the fact that Harley lived there.

16

Moreover, Defendants' consent argument rests on a strained construction of Plaintiffs' allegations that is wholly improper on a motion to dismiss. Stan O'Kelly's consent cannot be inferred from the mere fact that he did not eject the officers after they were already on the property. "To permit the government to show consent to enter from the lack of an objection to the entry 'would be to justify entry by consent and consent by entry. This will not do.'" *Bashir*, 445 F.3d at 1329, quoting *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996); *see also Bates v. Harvey*, 518 F.3d 1233, 1244 (11th Cir. 2008) ("we cannot imply consent from [an occupant's] failure to object"). Still less can any inference of consent be drawn from the mere fact that Jan O'Kelly did not attempt to throw the Deputies off the property once she arrived. She was called away from a night at the community theater because the Deputies had her home under armed siege; when she got there, they would not allow her onto her own property. She could not possibly have thought she had a choice about their presence at that point.

Defendants' argument also ignores the well-established rule that the exceptions to the warrant requirement are "jealously and carefully drawn" and cannot be broadly construed. *Jones v. United States*, 357 U.S. 493, 499 (1958). In particular, "[a] consensual search is confined to the terms of its authorization." *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006) (quoting *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990)). Thus,

17

even if the Deputies had obtained implicit consent to be in the outer driveway of the property (which they did not), that would not have given them the right to cross the gate and enter the curtilage.

Indeed, Defendants do not appear to contend that they had consent to enter the curtilage of the O'Kelly/Turner home. By the time they crossed that line, they had sequestered Stan and Jan O'Kelly from the scene and were dealing solely with Harley, who actively and vocally objected to their presence. His objections trumped any arguable consent on the part of Stan or Jan as a matter of clearly established law. *See Georgia v. Randolph*, 547 U.S. 103, 120 (2006) (police may not use the consent of one co-resident to override the Fourth Amendment rights of another, physically present co-resident who objects). Thus, Defendants' effort to rely on consent to circumvent the warrant requirement is entirely baseless.

## C.   There was no valid *Terry* stop.

The Deputies attempt to manufacture a justification for their use of force by arguing that their encounter with Harley was a brief investigative detention upon reasonable suspicion of the crime of terroristic threat pursuant to *Terry v. Ohio*, 392 U.S. 1 (1964), and that Harley's refusal to cooperate with that *Terry* stop supposedly gave rise to probable cause to arrest him for obstruction. This argument fails as a matter of clearly established law.

18

As an initial matter, the Official Code of Georgia explicitly provides that it is **not a crime** to threaten, or even to **use** force, to the extent one reasonably believes it necessary to prevent someone from trespassing on real property that is in the lawful possession of oneself or one's immediate family. O.C.G.A. § 16-3-24(a). Kevin Moss's allegations of such conduct therefore did not support reasonable suspicion for the crime of terroristic threat, as Defendants wrongly contend. In addition, Georgia's terroristic threat statute requires that the threat be made "[w]ith the purpose of terrorizing another . . . ." O.C.G.A. § 16-11-37(a). Making such threats for the purpose of scaring away trespassers from one's property does not meet this standard.

The deeper problem with Defendants' argument, however, is that it ignores the well-settled rule that "the police may not use *Terry* as an end-run around the warrant requirement in the context of a standard, on-going police investigation." *United States v. Valerio*, 718 F.3d 1321, 1324 (11th Cir. 2013). Indeed, *Terry* was never intended to be a replacement for the Fourth Amendment's warrant requirement: the *Terry* Court itself reiterated that "whenever practical, [the police must] obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry v Ohio*, 392 U.S. 1, 20 (1968).

Applying these principles in *Moore v. Pederson*, 6 F.3d 1036, 1046 (October 15, 2015), the Eleventh Circuit rejected the same argument that Defendants attempt

to make now. The law enforcement officer in that case, Kevin Pederson, purported to be conducting a *Terry* stop of plaintiff Elvin Moore in the doorway of Moore's home. 806 F.3d 1036, 1039. When Moore refused to identify himself, Pederson "concluded that he had probable cause to believe that Moore had violated the law by resisting an officer." *Id.*[1] Pederson therefore reached across the threshold and apprehended Moore. *Id.* But the Eleventh Circuit flatly rejected Pederson's justification for the seizure:

> We have said that an officer may not enter the home for the purpose of effecting a warrantless arrest unless that officer has both probable cause and either exigent circumstances or consent. *Bashir*, 445 F.3d at 1328. So we cannot see how law enforcement could enter a home to detain a person on reasonable, articulable suspicion of a criminal violation (resisting an officer without violence)—a much lower standard than probable cause—when neither exigent circumstances nor consent exist. That just makes no sense to us. *See United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001) ("It would defy reason to hold . . . that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest.").

*Moore*, 806 F.3d at 1046. The *Moore* decision came down on October 15, 2015, nine days before the events at issue in this case. Thus, at the time the Deputies shot Harley, the law was clearly established that that police **cannot** make a valid *Terry* stop within the boundaries of the home.

---

[1]      Like the Defendants here, Pederson covered his bases by arguing that he also had exigent circumstances and consent. *Id.* The Eleventh Circuit rejected these arguments.

The only possible distinction between *Moore* and the present case is that Harley was in the curtilage of his dwelling rather than inside the dwelling structure. But that is a distinction without a difference. As demonstrated already, it is clearly established that the curtilage of a home receives the same constitutional protection as the home does. *Oliver*, 466 U.S. at 180 (holding that the curtilage of the home "has been considered part of the home itself for Fourth Amendment purposes"); *Taylor*, 458 F.3d at 1206 ("The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself."); *Gilmere*, 774 F.2d at 1501 (the "firm line" of the warrant requirement "has been extended to include the surrounding curtilage of the home"). Thus, in the Eleventh Circuit on October 24, 2015, it was clearly established law that an officer could not conduct a valid *Terry* stop within the curtilage. Harley's non-cooperation with such a detention therefore could not create probable cause for his arrest.

**D.    There were no exigent circumstances to support a warrantless arrest.**

The Supreme Court has held that "the police bear a heavy burden" when "attempting to demonstrate an urgent need that might justify warrantless searches." *Welsh v Wisconsin*, 466 US 740, 749-750 (1984). In order to validate an infringement of Fourth Amendment interests under the exigent circumstances

21

exception, "the Government must demonstrate both exigency and probable cause." *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002).[2]

"The exigent circumstances doctrine applies only when the inevitable delay incident to obtaining a warrant must give way to an urgent need for *immediate action*." *United States v. Satterfield*, 743 F.2d 827, 844 (11th Cir.1984) (emphasis in original). Examples include hot pursuit of a suspect, *United States v. Santana*, 427 U.S. 38, 42-43 (1976); mobility of a vehicle, *Chambers v. Maroney*, 399 U.S. 42 (1970); risk of removal or destruction of evidence, *United States v. Rubin*, 474 F.2d 262 (3d Cir.), *cert. denied*, 414 U.S. 833 (1973); and imminent danger to arresting officers or the public, *Warden v. Hayden*, 387 U.S. 294 (1967). Defendants cannot meet this stringent standard.

When the initial 9-1-1 call took place at 8:28 p.m., there was no emergency: the alleged incident with the coon-hunters was already over and the alleged victim

---

[2]   Defendants incorrectly attempt to argue that arguable probable cause would be sufficient to justify entering Harley's yard to arrest him, even without exigent circumstances. (Doc. 17-1, p. 15 ("with such arguable probable cause, there also existed the associated right to go upon [Harley's] property, and [arrest him]").) The very case that Defendants cite for this erroneous proposition flatly refutes it. *See Coffin v. Brandau*, 642 F.3d 999, 1006 (11th Cir. 2011) ("'A finding of probable cause alone . . . does not justify a warrantless arrest at a suspect's home.'") (quoting *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986)). The language that Defendants mistakenly quote from *Coffin* merely states that an officer may use the path available to any member of the public to walk up to a door and knock to initiate a voluntary encounter with a resident. *See Coffin*, 642 F.3d at 1012 (11th Cir. 2011) ("In carrying out their duties, the police are free to go where the public would be expected to go."). This does not mean that they can sneak across a fence in the dark and hide behind a hedge while pointing a shotgun at the resident, as Deputy Curran did here. There is no implied invitation to the public to do that.

was away from the premises, in a place where he felt safe waiting for the Deputies to arrive to take his statement. (Doc. 1, ¶¶ 22-23.) The 9-1-1 operator reported that the incident was completed. (*Id.*, ¶ 24.) By the time the officers arrived at 1607 Carver Mill Road, it was 9:00 p.m., more than a half-hour after the 9-1-1 call. (*Id.*, ¶ 27.) There was no crime in progress at that time. (*Id.*) And, from the nature of the alleged past crime — a resident yelling threats at accused trespassers — there also was not any likely danger of destruction of evidence, or that the suspect would flee and become unfindable.

The Deputies found Harley at home when they called. (*Id.*, ¶ 29.) He was armed and agitated (*id.*), but after all, he was on the property where he lived, and the Complaint specifically alleges that he never pointed the gun at the Deputies or threatened them. (*Id.*, ¶ 37.) Indeed, after the Deputies identified themselves as law enforcement, Harley tried to walk away from them and return to his cabin, admonishing them to "just keep trespassers away." (*Id.*, ¶¶ 32-33.) But the Deputies would not let him disengage, ordering him at gunpoint to return to the gate. (*Id.*, ¶ 33.) It is reasonable to infer, then, that they did not believe Harley posed an imminent threat. If they had thought so, then presumably they would have taken immediate action, which they did not do. *See Satterfield*, 743 F.2d at 844 (requiring "an urgent need for *immediate action*" for the exigent circumstances exception to the warrant requirement).

23

During the next half-hour of conversation, Harley repeated that he just wanted the Deputies to keep trespassers away, and that he wished they would all leave so he could go to bed. (*Id.*, ¶ 35.) The Deputies plainly did **not** think Harley was an immediate threat to them at that point, because they allowed him to walk back to his cabin to get a drink of water. (*Id.*, ¶ 40.) Had he wanted to harm them, he could have taken cover and begun shooting. But instead, when Harley returned from his cabin, he had a flashlight in one hand and a jug of water in the other, and he again repeated that he was not the aggressor and he wanted to go to bed. (*Id.*, ¶ 41.)

At that point, Harley **offered to talk** with the Deputies, which they now contend to have been the entire purpose for detaining him in the first place. (*Id.*, ¶ 42.) Their opportunity to investigate was at hand, if that was really what they wanted. But rather than talk with Harley, the Deputies instead carried out their plan for Deputy Curran to shoot him with a twelve-gauge shotgun loaded with a "less lethal" shot-filled beanbag round. (*Id.*, ¶ 43.) This approach was not "less lethal" for Harley, as anyone could have foreseen. (*Id.*, ¶ 44.) Under attack, he returned Deputy Curran's gunfire and was killed. (*Id.*)

None of the exigent circumstances approved by the case law are applicable here. The alleged crime was merely verbal at most, and likely was not a crime at all. The Deputies knew exactly where to find their suspect. There was no risk of

destruction of evidence. And, drawing all inferences in favor of the Plaintiffs, the officers did not believe that Harley was an imminent threat to them. Harley repeated at several points in the encounter that he just wanted to go to bed. At any of these points, the Deputies could have gone away, gotten a warrant (if the magistrate would issue one), and let the whole situation cool down. Instead, they chose — that is the only word for it — to escalate hostilities from an argument to a firefight, resulting in the death of a man in his own yard. These allegations state a claim for violation of Harley's civil rights.

### E.   The Deputies fail to establish that their use of force was reasonable as a    matter of law.

"[E]ven *de minimis* force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect . . . ." *Zivojinovich v. Barner*, 525 F.3d 1059, 1071 (11th Cir. 2008) (per curiam). Where grounds for arrest exist — which was not true here — the question becomes "whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him . . . ." *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

Defendants, predictably, attempt to characterize this as a case where the officers believed their lives were in danger, but used non-lethal force until the point when Harley began firing live rounds. But that is not the version of the facts that emerges when the allegations of the Complaint are taken in the light most

favorable to the Plaintiffs as the non-moving parties. As demonstrated above, it is by no means obvious that Defendants **ever** thought Harley posed an imminent threat to their lives or well-being. Among other things, they stood there talking to him for well over half an hour — not something they would be likely to do, if they thought their lives were in danger. And it is highly unlikely that they felt imminently threatened at the time Deputy Curran fired the beanbag rounds, when they had just allowed Harley to disappear from view into his cabin and come back with a flashlight in one hand and a jug of water in the other. Further proving that they did not believe Harley was a threat at that point, they sent Deputy Kerger — the only female deputy, who was on her first day of patrol — to stand in the driveway, unarmed, and lure Harley towards the fence. Plainly, they knew he was not going to shoot her.

On the whole, the most reasonable inference from the facts of the Complaint is that the Deputies simply did not find Harley to be an imminent threat. Certainly, that is the necessary inference under the applicable legal standard on Defendants' Motion to Dismiss. And once the Deputies' argument that they were in fear for their lives is rejected, their argument that they could reasonably shoot him with a beanbag round from a shotgun falls apart like a house of cards. If all they needed to do was arrest Harley, and no one was in imminent danger, they could have left, obtained a warrant, and come back another day. No one had to die. But to fire three

rounds from a twelve-gauge shotgun — which Harley would not have known were non-lethal rounds — was to set off a firefight, with the inevitable result that Harley, hopelessly outgunned and standing in the crosshairs of concealed snipers, would be killed. *See* Doc. 1, ¶¶ 51-53 (alleging that all of the Deputies and the GSP officers knew that a firefight would ensue, and that Harley likely would be killed, if they fired on Harley). No reasonable officer could have thought that to be a reasonable outcome for an incident that started as a purely verbal dispute between two Pickens County citizens at a property line and ended with a man offering to talk and saying that he just wanted to go to bed.

### F.  All of the Deputies are liable for failure to intervene.

Tellingly, Defendants do not argue that the non-shooting Deputies are somehow free from liability simply because they did not shoot. Such an argument would be meritless, because "[a] police officer has a duty to intervene when another officer uses excessive force." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir. 1993); *see also Fundiller v. Cooper City*, 777 F.2d 1436, 1441-2 (11th Cir. 1985). This law was clearly established in this Circuit at least as early as 1994. *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000). The Complaint alleges that all of the Deputies knew there was no warrant, but nevertheless helped seize Harley within the curtilage of his home. (Doc. 1, ¶¶ 48-50.) The Complaint further alleges that all of the Deputies knew Harley would

27

shoot back if he were attacked, and that they all nevertheless acquiesced in the plan to shoot him with beanbag rounds. (*Id.*, ¶¶ 51-53.) These allegations are sufficient — as Defendants apparently do not dispute — for liability to extend to all of the Deputies, not just the ones who actually shot at Harley. Every single law-enforcement officer who swore an oath to uphold the Constitution, and then stood by and watched Harley's constitutional rights to life and liberty be taken away, should be liable for their culpable inaction just as if they had pulled the trigger.

### G.     Plaintiffs' claims under Georgia law also are legally viable.

Defendants argue that they are entitled to official immunity as a matter of Georgia law, and that Plaintiff's state law wrongful death claims therefore should be dismissed. That argument is incorrect.

As the Supreme Court of Georgia recently explained in the case of *Pearce v. Tucker*, 299 Ga. 224, 227 (2016):

> Qualified immunity, also known as official immunity, protects individual public agents from personal liability for *discretionary* actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. On the other hand, "a public officer or employee may be personally liable … for *ministerial* acts negligently performed or acts performed with malice or an intent to injure.

*Pearce*, 299 Ga. at 227 (internal quotation marks and citations omitted; emphasis in *Pearce*). An intentional shooting without justification satisfies the standard of "actual intent to cause injury." *Kidd v. Coates*, 271 Ga. 33, 34, 518 S.E.2d 124,

125 (1999) (denying official immunity); *see also Gardner v. Rogers*, 224 Ga. App.

165, 169 (1996). Because Plaintiffs have alleged exactly that, Defendants' claim to

official immunity under Georgia law must fail.

## II.    The Complaint alleges a sufficient claim against Sheriff Craig.

The Supreme Court has held that a state law-enforcement supervisor who

fails to give his or her officers adequate training in the constitutional limits on the

use of deadly force may be liable under Section 1983 where the lack of training

causes a deprivation of the relevant constitutional rights. *City of Canton v. Harris*,

489 U.S. 378, 390 n.10, 109 S. Ct. 1197, 1205, 103 L.Ed.2d 412, 427 (1989)

("policymakers know to a moral certainty that their police officers will be required

to arrest fleeing felons. The city has armed its officers with firearms, in part to

allow them to accomplish this task. Thus, the need to train officers in the

constitutional limitations on the use of deadly force, *see Tennessee v. Garner*, 471

U.S. 1 (1985), can be said to be 'so obvious,' that failure to do so could properly be

characterized as 'deliberate indifference' to constitutional rights.").

Here, the Complaint alleges that Sheriff Craig "failed to institute adequate

policies and training to govern arrest procedures and the use of force, including the

use of deadly force, by PCSO deputies." (Doc. 1, ¶ 65.) It is further alleged that, as

a result, his Deputies violated Harley Turner's constitutional rights. (*Id.*, ¶¶ 66-67.)

These conclusions are a reasonable inference from the fact that **six** of Sheriff

Craig's deputies allowed a mere trespassing dispute to escalate into a deadly bloodbath, apparently without giving a thought to the warrant requirement — a safeguard of liberty that has existed since before the American Revolution.

Incredibly, Sheriff Craig attempts to argue that he needed a widespread pattern of prior incidents to put him on notice that his deputies needed training in the constitutional limits of the use of force. The facts that the Supreme Court deems this an obvious area of training, and that Sheriff Craig's deputies displayed such egregious disregard for fundamental constitutional rights in this area, amply support Plaintiffs' claim for failure to train. *See Arnold Rogers v. City of Orlando*, 660 F. App'x 819, 827 (11th Cir. 2016) (upholding claim for failure to train regarding proper procedure for warrantless arrests in the home); *see also Bruce v. Beary*, 498 F.3d 1232, 1249 (11th Cir. 2007) (upholding claim for failure to train regarding exceptions to warrant requirement, where there was evidence that officers conducted an improper warrantless search).

## CONCLUSION

For the reasons set forth above, the Pickens Sheriff's Office Defendants' Motion to Dismiss should be **DENIED.**

This 13th day of March, 2018.

Respectfully submitted,

*s/ Leighton Moore*

30

Leighton Moore
Georgia Bar No. 520701
**The Moore Law Firm, PC**
100 Peachtree Street NW
Suite 2600
Atlanta, Georgia 30303
(678) 237-0330
leighton@moorefirmpc.com

*Attorney for Plaintiffs*

## CERTIFICATION OF COMPLIANCE and SERVICE

The undersigned counsel certifies that the foregoing document has been prepared using Times New Roman, 14 point.

I hereby certify that I have this day electronically filed with the Clerk of Court the foregoing BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

This 13th day of March, 2018.

*s/ Leighton Moore*
Leighton Moore
Ga. Bar No. 520701

32